**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **BENJAMIN ROBERTS,** | \* |
| Plaintiff, | \* |
| v. | \*   Case No.: GJH-13-3475 |
| **SAINT AGNES HOSPITAL,** | \* |
| Defendant. | \* |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

This is a race discrimination and retaliation case brought by *pro se* Plaintiff Benjamin Roberts ("Roberts") against his former employer, Saint Agnes Hospital ("the Hospital"), for purported violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*. This Memorandum Opinion and accompanying Order address the Hospital's motion for summary judgment. *See* ECF No. 33. A hearing is not necessary. *See* Loc. R. 105.6 (Md.). For the reasons stated below, the Hospital's motion for summary judgment is GRANTED. Roberts' complaint is therefore dismissed with prejudice.

I.   **BACKGROUND**

The Hospital is a full-service hospital and Catholic health care ministry that provides care to the individuals that it serves in the Baltimore Metropolitan Area. *See* ECF No. 33-1 at ¶ 1. Within the Hospital, there are two laboratories, the Microbiology Laboratory – where Roberts was employed – and the Core Laboratory. *See* ECF No. 33-3 at ¶ 4. The laboratories perform tests on biological samples for patients of the Hospital. *See id.*

The Hospital's laboratories are required by federal law to comply with the Clinical Laboratory Improvement Amendments ("CLIA") and its implementing regulations. *See id.* at ¶ 6; *see also* 42 C.F.R. § 493.1 *et seq*. As part of the Hospital's CLIA compliance, the Laboratory Services Department has issued written procedures governing all aspects of clinical work. *See* ECF No. 33-3 at ¶ 7. Employees are required to comply with those procedures. *See id*. The department is also subject to proficiency testing, a quality control program, and on-site inspections. *See id.* The laboratories are also accredited with the College of American Pathologists ("CAP"), a leader in laboratory quality assurance. *See id.* at ¶ 8. The consequences of failing to maintain and enforce established procedures can be significant for the Hospital. *See id.* at ¶ 9. For example, ensuring that laboratory employees follow established protocols is a condition of being accredited by CAP. *See id.* And failure to comply with CLIA and to enforce the required procedures can result in an enforcement action and possible sanctions against the Hospital, including facility closure and criminal penalties. *See id.*; *see also* 42 C.F.R. § 493.186.

One such required policy is the Laboratory Administration Occurrence Reporting policy. *See* ECF No. 33-3 at ¶ 10. This policy is designed to detect, investigate, report, track, and trend events that do not conform with established policies, processes, and procedures. *See id*. Under that policy, significant, unexpected, or unusual events are to be reported on an Occurrence Report Form ("ORF"). Examples of such occurrences include significant quality control problems or inappropriate remedial actions or documentation; deviations from policy or procedures; service issues such as delay of test results; and communication issues. *See id.* at ¶ 11. Every laboratory employee is expected to prepare an ORF whenever he or she becomes aware of an incident that constitutes an occurrence. *See id.* at ¶ 12.

Another important laboratory policy governs what are called "Alert Values." *See id.* at ¶ 14. This policy sets forth the procedures to be followed when a laboratory test produces results that show that a patient has a potentially dangerous or life-threatening infection. *See id.* Such a result is called an "Alert Value." *See id*. These Alert Value procedures must be followed whenever a lab employee receives a result indicating a potentially life-threatening infection. *See id.* Under these procedures, the employee must call in the result to the Emergency Department or Hospital floor where the patient is being treated within two hours of obtaining the result and document in the electronic medical record that the call was made as well as who received the call. *See id.* at ¶ 15. Failing to perform any of these steps is a violation of the Alert Value protocol. *See id.*

On October 24, 2005, Roberts, an African-American man from the Caribbean island of Turks and Caicos, was hired by the Hospital as a part-time employee assigned to work in the Microbiology Laboratory as the Lead Technologist. *See id.* at ¶¶ 18-19. The position of Lead Technologist includes a number of supervisory and administrative responsibilities, including but not limited to: writing and maintaining procedures, training checklists, and competency assessments of the Laboratory; participation in monthly financial reviews; performance appraisal, monitoring, and counseling of other employees; and facilitating sectional meetings. *See id.* at ¶ 20. But Roberts was never assigned any of these responsibilities. *See id.*; *see also* ECF No. 33-6 at 70.[1] Instead, Roberts' job duties were those of a Medical Technologist, which included performing lab tests, evaluating test results for clinical significance, and communicating those results to the appropriate hospital staff. *See* ECF No. 33-3 at ¶ 21; *see also* ECF No. 33-6

---

[1] For the citations in this Memorandum Opinion, the Court uses the page numbers assigned to the document from CM/ECF or PACER.

at 70. Roberts reported to Lead Technologists Jane Weiger ("Weiger") and Peg Kinch. *See* ECF No. 33-3 at ¶ 23.

In June 2006, the Hospital made the decision to re-align job titles of certain positions in the laboratories to better fit the responsibilities of the positions. *See* ECF No. 33-4 at 6. As a result, Roberts' job title changed to Medical Technologist. *See id*. This change in Roberts' title had no effect on his job duties or his pay. *See* ECF No. 33-6 at 78.

In December 2008, a vacancy arose within the Microbiology Laboratory for a Medical Technologist II, which would have been a promotion for Roberts. *See* ECF No. 33-4 at ¶ 8. The position was posted in accordance with the Hospital's standard job-posting process. *See* ECF No. 33-7 at 26. Roberts, who was aware of the Hospital's system of posting vacant positions, did not apply for this job. *See* ECF No. 33-6 at 81, 148. Ultimately, the Hospital selected Kelly Ward ("Ward"), a Caucasian woman, to fill the Medical Technologist II position. *See* ECF No. 33-4 at ¶ 8.

In February 2009, following a review of employee productivity, the Hospital concluded that Roberts was having difficulty completing his work within the defined hours of his shift. *See* ECF No. 33-3 at ¶ 29. As a result, Weiger met with Roberts to explain to him the importance of completing his work on time. *See id.* at ¶ 31. Weiger documented this counseling meeting in an Action Plan that was presented to Roberts at that time. *See id*.; *see also id*. at 48. According to Roberts, however, these difficulties arose from the fact that his workload was increasing and was becoming too much for him to complete within his scheduled hours. *See* ECF No. 33-6 at 57-61. During the months that followed, Roberts frequently complained to Weiger that, in his opinion, his workload was too high. *See* ECF No. 33-3 at ¶ 37. Then, in the fall of 2009, the Hospital undertook additional efforts to assess employee productivity. *See id* at ¶¶ 39-44. The results of

these efforts revealed that Roberts was working longer hours than his colleagues, but was processing fewer specimens. *See id.*

In November 2009, a meeting was held between Roberts, Weiger, and other Hospital administrators during which he expressed, for the first time, his belief that he was being discriminated against because of his race and national origin. *See* ECF No. 33-6 at 78-79; *see also* ECF No. 33-3 at ¶ 46. The Hospital staff informed him that, in its view, this was not the case. *See* ECF No. 33-3 at ¶ 46.

In early 2010, Roberts' performance continued to suffer. Specifically, on January 26, 2010, Roberts failed to timely report an Alert Value on a positive blood culture. *See id.* at ¶ 54. Although the Alert Value Policy called for values to be called in and documented within two hours, the Alert Value in question was not called in for over 6 hours. *See id.* The Medical Technologist II working the day shift the next day, Ward, observed this and prepared an ORF. *See id.*; *see also id.* at 68.

That same day, Roberts also improperly loaded 64 samples into a laboratory machine called the BacT Alert. *See id.* at ¶ 55. Standard procedure called for patient data to be entered into the machine before samples were loaded; however, Roberts loaded the samples without loading patient data, which is called "anonymous" loading. *See id.* Anonymous loading requires the Technologist who later removes the samples from the machine to go back and enter the patient data, delaying the reporting of test results and imposing an unfair burden on that second Technologist. *See id.* Ward, the Technologist working the day shift, observed this and prepared an ORF. *See id.*; *see also id.* at 70. Although Weiger had previously told Roberts that anonymous loading may be done when the laboratory was busy, she also explained that it was not an acceptable general practice. *See id.* at ¶ 56; *see also* ECF No. 33-6 at 90-9. As a result of these

incidents, a meeting was held on January 28, 2010, between Roberts, Weiger, and Robert San Luis, a Lead Technologist. *See* ECF No. 33-3 at ¶ 57. This meeting was documented in a Counseling Report and a follow-up Action Plan was issued. *See id*; *see also id.* at 72-74.

On February 16, 2010, Roberts once again failed to call in an Alert Value within the required two hour window, in violation of the Alert Value policy. *See id.* at ¶ 67. This event was recorded in an ORF by Ward. *See id.*; *see also id.* at 98. Two days later, Roberts also failed to process two specimens that arrived at 10:00 p.m. despite the instructions in his recent Action Plan that he was responsible for all specimens that arrived before 11:00 p.m. *See id.* at ¶ 68. When those specimens were later tested by the day shift Technologist, one of them triggered an Alert Value. *See id.* Weiger subsequently filed an ORF. *See id.*; *see also id.* at 100. The following week, on February 23, 2010, Roberts again left a number of specimens unprocessed overnight. *See id.* at ¶ 69. This was recorded in an ORF by another employee, Christina Graves. *See id.*; *see also id.* at 102.

On March 2, 2010, Weiger and Jo Oliver ("Oliver"), the Administrative Director of the Laboratory Services Department, met with Roberts to address his concerns about his workload and to reiterate their expectations that had previously been explained to him at the earlier counseling session. *See id.* at ¶ 70. This counseling session was documented in Roberts' Action Plan. *See id.* at 104. On March 8, 2010, Oliver had a one-on-one meeting with Roberts to discuss his ongoing performance issues as well as his concerns regarding workload and unfair treatment. *See* ECF No. 33-4 at ¶ 10. Oliver investigated Roberts' concerns and, where appropriate, took corrective action. *See id.*

Despite the Hospital's efforts to assist Roberts in bringing his performance up to par, on still two more occasions in March 2010, Roberts loaded large numbers of samples anonymously,

resulting in ORFs being filed. *See* ECF No. 33-3 at ¶ 71; *see also id.* at 106-07. Oliver then met with Roberts again, on March 30, 2010, to discuss the Hospital's continuing performance concerns. *See* ECF No. 33-4 at ¶¶ 17-18. Subsequent to this meeting with Oliver, in April 2010, another employee working in sample processing called the Microbiology Laboratory and was told by Roberts that he could not assist her. *See* ECF No. 33-3 at ¶ 75. The employee also reported that Roberts was rude to her. *See id.* That employee filed an ORF documenting the incident. *See id.*; *see also id.* at 114-15. Also, in April and early May 2010, Roberts again, and in violation of the instructions he had previously been given, loaded large numbers of samples anonymously. *See id.* at ¶ 76. In these instances, Roberts also worked beyond the hours of his shift without obtaining prior approval as was required by the laboratory's overtime policy. *See id.* These violations were documented in a series of ORFs. *See id.*; *see also id.* at 117-20.

Given Roberts' repeated performance deficiencies, Oliver and Weiger decided to evaluate Roberts' assertion that his workload was unmanageable and to determine if there was any way they could help him. *See id.* at ¶ 78. As such, Oliver and Weiger asked Ward to observe Roberts at work during his shift on May 10, 2010. *See id.*; *see also* ECF No. 33-6 at 109-10. Prior to Ward observing Roberts, Oliver and Weiger met with him on May 6, 2010 to inform Roberts that he would be observed the following week. *See* ECF No. 33-4 at ¶ 20. During this meeting, they reviewed with him the recent ORFs that had been filed. *See id.*

The following week, Oliver and Weiger met with Roberts to discuss Ward's observations. *See id.* at ¶¶ 27-28. As was documented in the Counseling Report and Action Plan that was provided to Roberts, Ward observed a number of deviations from official laboratory procedures. *See* ECF No. 33-3 at ¶ 79; *see also id.* at 124-30. As part of the Action Plan that was prepared from this meeting, Roberts was referred to employee counseling to learn to

"appropriately note situations where the Lead Technologist and Med Tech II have made statements internalized as offensive so that clarification and awareness may be sought." *Id.* at 124-27. Roberts, however, chose not to attend counseling. *See* ECF No. 33-6 at 127-30. Despite the Hospital's repeated attempts to improve Roberts' performance, it still suffered.

On June 1, 2010, Roberts improperly processed two urine specimens by using the wrong procedure. *See* ECF No. 33-3 at ¶ 83; *see also id.* at 132. When Weiger asked Roberts about this mistake, he told her that he did not actually know the correct procedure. *See id* at ¶ 83; *see also id*. at 134. Then, on June 7 and June 14, 2010, Roberts again left a large number of anonymously loaded samples for the Day Shift Technologist to handle the next day. *See id.* at ¶ 85. Time stamping on those samples indicated that they had come in throughout Roberts' shift, which indicated to Weiger that there was not an emergency or extremely high level of work such as would justify loading bottles anonymously. *See id.* Roberts also left unprocessed cultures on both days, all of which were received before 11:00 p.m. *See id.* He did not document these issues in the communication log or explain why these specimens were left, in violation of the Hospital's communication at hand-off policy. *See id.* Also, on June 14, Roberts again failed to process urine samples according to the required procedures. *See id.* These failures were documented in ORFs by Hospital staff. *See id.* at 136-38.

As a result of these, and other failures, Oliver and Weiger became increasingly concerned about Roberts' overall failure to comply with laboratory policies. *See id.* at ¶ 86; *see also* ECF No. 33-4 at ¶ 33. Accordingly, they met with a Senior Employee Relations Consultant, Alfreda Harrid ("Harrid") to discuss remedial action. *See* ECF No. 33-3 at ¶ 86. Harrid reviewed the facts and determined that Roberts' conduct had violated the Hospital's policies on several occasions and would support suspension under the Hospital's Progressive Corrective Action policy. *See*

8

ECF No. 33-5 at ¶ 13. Thus, on June 15, 2010, Oliver and Weiger recommended that Roberts be suspended. *See* ECF No. 33-3 at ¶ 86; *see also id.* at 140. That suspension was approved by Human Resources Vice President James Bobbitt and went into effect on June 17, 2010. *See* ECF No. 33-3 at ¶ 86; *see also id.* at 140.

Following Roberts' suspension, his performance troubles continued. On August 19, 2010, Roberts once again failed to call in or document an Alert Value. *See* ECF No. 33-3 at ¶ 95; *see also* ECF No. 33-4 at ¶¶ 37-38. Shortly thereafter, a meeting was held between Weiger, Oliver, and Harrid to discuss this violation. *See* ECF No. 33-3 at ¶ 95; *see also* ECF No. 33-4 at ¶¶ 37-38. Given the seriousness of the violation, as well as the fact that Roberts had previous violations of the Alert Value policy, and the fact that he already had been suspended for performance-related issues, Oliver and Weiger recommended that Roberts be terminated. *See* ECF No. 33-3 at ¶ 95; *see also* ECF No. 33-4 at ¶¶ 37-38. Harrid agreed and Roberts was terminated on August 27, 2010 by Human Resources Vice President James Bobbitt and Hospital Vice President Yolanda Copeland. *See* ECF No. 33-3 at ¶ 95; *see also* ECF No. 33-4 at ¶¶ 37-38.

Roberts has since filed the instant Title VII lawsuit against the Hospital claiming that his discharge was discriminatory and in retaliation for his complaints about workplace discrimination. *See* ECF No. 1 at 5-6. Roberts also contends that he was treated differently than similarly situated white employees by (1) being insulted by his white supervisors; (2) not being given an annual review for 2009; (3) being demoted from Lead Technologist to Medical Technologist; and (4) being subjected to increased monitoring. *See id.* at 2, 5-6. Roberts also maintains that the Hospital discriminated against him by failing to promote him to the Medical Technologist II position, choosing instead to promote Ward to that position. *See id* at 5-6. The Hospital has moved for summary judgment. *See* ECF No. 33. For the reasons discussed more

9

fully below, the Court will grant the Hospital's motion and dismiss Roberts' complaint with prejudice.

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Title VII

Title VII makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits

discrimination against an employee in retaliation for the employee's opposing the employer's illegal discrimination practices or participating in Title VII enforcement proceedings. *See* 42 U.S.C. § 2000e–3(a). To establish a claim for race-based or nationality-based discrimination under Title VII, Roberts may proceed using either of two methods. First, he may demonstrate "through direct or circumstantial evidence" that his race or nationality "motivated the employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), or, alternatively, he may "proceed under a 'pretext' framework" – commonly referred to as the *McDonnell Douglas* approach – under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually pretext for discrimination." *Id.* at 285. Because Roberts has presented no direct evidence that the Hospital discriminated against him, he must establish his case circumstantially using the pretext framework established in *McDonnell Douglas. See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

       **1.**     **Disparate Treatment**

Under the *McDonnell Douglas* framework, Roberts must first demonstrate a *prima facie* case of disparate treatment, which requires him to show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) his employer treated similarly situated employees outside his protected class more favorably. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Hill*, 354 F.3d at 285. Here, Roberts' disparate treatment claims fail because the overwhelming majority of actions that he challenges are not adverse employment actions. And as for those acts that do qualify as adverse employment actions (*i.e.* his suspension and termination), Roberts has failed to establish

that he was meeting the Hospital's legitimate job expectations at the time of these events or that he was replaced by someone outside his protected class. Moreover, even if Roberts had established a *prima facie* case, the Hospital has provided compelling evidence of its legitimate non-discriminatory reasons for its actions—namely, Roberts' unsatisfactory performance. Roberts has provided no evidence that this proffered reason was a pretext for a discriminatory motive.

          a.        **Adverse Employment Action**

An "adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 436 (D. Md. 2012) (quoting *Thorn v. Sebelius*, 766 F.Supp.2d 585, 598 (D. Md. 2011)). An "adverse employment action" must affect "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n. 6 (D. Md. 2009).

Here, Roberts contends that he suffered adverse employment actions when he was (1) insulted by his white supervisors; (2) not given an annual review for 2009; (3) demoted from Lead Technologist to Medical Technologist; and (4) subjected to increased monitoring. *See* ECF No. 1 at 2, 5-6. None of these actions, however, qualify as adverse employment actions and therefore cannot support Roberts' disparate treatment claim.

First, mere insults that do not have a tangible effect on the terms and conditions of employment do not amount to an adverse employment action. *See e.g.*, *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261 (4th Cir. 2001) (holding alleged lack of civility of co-workers, consisting mostly of refusals to speak to employee insufficient to alter terms and conditions of employment); *Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 587 (D. Md. 2002) (two verbal reprimands did not amount to adverse employment actions where there was no evidence that they led to a demotion, termination, or had any impact on the plaintiff's job performance); *Settle v. Baltimore Cnty.*, 34 F.Supp.2d 969, 989 (D. Md. 1999) ("not everything that makes an employee unhappy is an actionable adverse action").

Nor does the fact that Roberts did not receive an annual review in 2009 rise to the level of an adverse employment action since Roberts has failed to adduce any evidence to demonstrate that the Hospital's failure to provide him with an annual review affected the terms, conditions, or benefits of his employment. *See Manguiat v. Bd. of Educ. of Prince George's Cnty.*, No. 13-1165, 2015 WL 2376008, at *7 (D. Md. May 18, 2015) (finding that "the School Board's failure to provide Manguiat with an annual review at the completion of the 2009-2010 school year was not an adverse action as it had no immediate effect on the terms, conditions, or benefits of her employment").

Additionally, while a demotion can amount to an adverse employment action, Roberts was not actually demoted from Lead Technologist to Medical Technologist; rather, he had his title changed to more accurately reflect his job responsibilities. *See* ECF No. 33-4 at ¶¶ 5-6. There is simply no evidence to suggest that Roberts' title change altered his salary, benefits, or otherwise impacted his job responsibilities. In fact, Roberts concedes that neither his pay nor his job responsibilities were altered as a result of his title change. *See* ECF No. 33-6 at 78. The Court

therefore cannot conclude that Roberts' title change was an adverse employment action. *See Cleary v. Nationwide Mut. Ins. Co.*, 9 Fed.Appx. 1 (4th Cir. 2001) (holding no adverse employment action where employee's title was changed, employee was transferred to a different office farther from her home, and she was given different responsibilities but basic salary and position remained the same); *see also Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 591 (D. Md. 2012) (finding no tangible employment action where employee's title was changed from "accounts receivable revenue supervisor" to "accountant III" but employee's salary and job remained unchanged).

Finally, Roberts' complaints of discriminatory monitoring are, at most, "petty slights, minor annoyances, and simple lack of good manners," *see Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006), that cannot be classified as materially adverse employment actions, especially where, as here, there is no evidence to suggest that the alleged monitoring had a tangible effect on the terms and conditions of employment. *See Livingston v. Datex-Ohmeda, Inc.*, No. 05-3401, 2008 WL 7289608, at *3 (D. Md. May 7, 2008) (plaintiff's "complaints that she was singled out and strictly monitored and that her time sheets were scrutinized, are, at most, 'petty slights, minor annoyances, and simple lack of good manners,' that cannot be classified as materially adverse employment actions").

Roberts therefore cannot rely on any of these actions to support his *prima facie* case of disparate treatment. Instead, he can only rely upon his suspension and termination in June 2010 and August 2010, respectively, as the adverse employment actions that support his disparate treatment claim. But even in this regard, Roberts' disparate treatment claim still must be dismissed, as he has failed to establish that he was meeting the Hospital's legitimate job expectations at the time of his suspension and termination or that he was replaced by someone

outside his protected class. *See Miles v. Dell, Inc.,* 429 F.3d 480, 486 (4th Cir.2005) (recognizing the "general rule[] [that] Title VII plaintiffs must show that they were replaced by someone outside their protected class" in discriminatory discharge cases)

### b. Job Performance

First, to demonstrate at the summary judgment stage that an employee was meeting his employer's performance expectations, Roberts must "demonstrate that he was generally satisfying his employer's relevant, objective performance standards at the time of his termination." *Brown v. Siemens Healthcare Diagnostics, Inc.*, Case No. 11-0769, 2012 WL 3136457, at *7 (D. Md. July 31, 2012). And while this burden "is not onerous" (*id.*), Roberts has failed to meet it here. *See supra* at 3-9. Specifically, as discussed at length above, Roberts repeatedly failed to follow the Hospital's Alert Value procedure, which severely undermined patient safety and jeopardized the Hospital's accreditation. Additionally, Roberts regularly processed specimens incorrectly and in violation of Hospital policies, despite repeated warnings. *See id.* Roberts has therefore failed to demonstrate that he was meeting the Hospital's legitimate performance expectations at the time of his suspension and termination; rather, the evidence in the record affirmatively demonstrates that he *was not* meeting the Hospital's performance expectations, which is why he was initially suspended in June 2010 and then ultimately terminated in August 2010.

### c. Similarly Situated Employee

Additionally, Roberts has failed to satisfy the fourth element of his *prima facie* case. That is, Roberts has failed to demonstrate that, following his termination, his position as Medical Technologist remained open or was filled by someone outside of his protected class. In the Fourth Circuit, it is "a general rule [that] Title VII plaintiffs must show that they were replaced

by someone outside their protected class in order to make out a prima facie case." *Miles*, 429 F.3d at 486. Here, Roberts does not even contend that following his termination he was replaced by someone outside of his protected class, let alone have any evidence to support this position. For this additional reason then, Roberts has failed to satisfy his *prima facie* case of disparate treatment. *See Ford v. Berry Plastics Corp.*, No. 12-0977, 2013 WL 5442355, at *8 (D. Md. Sept. 27, 2013) (granting summary judgment in favor of employer-defendant where female, African–American "[p]laintiff has not even alleged, let alone produced evidence, that she was replaced either by a male or by a non-African-American person").[2]

### 2. Failure to Promote

Roberts also contends that the Hospital discriminated against him by failing to promote him to the Medical Technologist II position for which he claims he was qualified, choosing instead to give the position to Ward, a Caucasian employee. *See* ECF No. 1 at 5-6. To establish a *prima facie* case of failure to promote in violation of Title VII, Roberts must show that he (1) "is a member of a protected group; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Derrickson v. Circuit City Stores, Inc.*, 84 F. Supp. 2d 679, 693 (D. Md. 2000) (citing *McNairn v. Sullivan*, 929 F.2d 974, 977 (4th Cir. 1991)). "If an employer has a formal system of posting vacancies and allowing employees to apply for such vacancies, an

---

[2] In *Miles*, the Fourth Circuit recognized that "there may be exceptions to th[e] rule" requiring the plaintiff to show that he or she was replaced by someone outside the protected class. 29 F.3d at 486. Specifically, the Court identified the following exceptions to the rule: (1) when an age discrimination plaintiff is replaced by a much younger person within the same class, (2) when a significant lapse of time occurs between the adverse employment action and the decision to hire another person, (3) when the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination; and (4) when the firing and replacement hiring decision are made by different individuals. *See id.* at 486-88. Roberts has failed to identify any evidence to suggest that any of these scenarios occurred in this case.

employee who fails to apply for a particular position cannot establish a prima facie case of discriminatory failure to promote." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004). Here, it is undisputed that (1) the Hospital maintained a formal system for posting vacancies (*see* ECF No. 33-6 at 81); (2) the Hospital posted the vacancy for the Medical Technologist II position pursuant to that system (*see* ECF No. 33-4 at ¶ 8); and (3) Roberts did not apply for this position. *See* ECF No. 33-6 at 148. Under these circumstances then, Roberts' claim of discriminatory failure to promote fails as a matter of law.

### 3. Retaliation

Roberts also asserts a retaliation claim against the Hospital. *See* ECF No. 1 at 5-6. Specifically, Roberts contends that he was terminated in retaliation for raising his complaints about alleged workplace discrimination. *See id.* Title VII prohibits discrimination against an employee in retaliation for the employee's opposing the employer's illegal discrimination practices or participating in Title VII enforcement proceedings. *See* 42 U.S.C. § 2000e-3(a). Claims of retaliation are governed by the same proof schemes applicable to the Title VII discrimination claims, except that proof of retaliation requires but-for causation; the mixed-motive analysis is inapplicable to retaliation claims. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005); *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002). In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court recently clarified that Title VII does not permit retaliation claims to be proved based on any showing other than but-for causation. 133 S.Ct. 2517 (2013) (finding no meaningful difference between the texts of the retaliation provision of Title VII and the Age Discrimination in Employment Act ("ADEA") and holding, therefore, that Title VII retaliation claims, like

claims brought under ADEA, require but-for causation) (citing *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 176 (2009)).

Under the *McDonnell Douglas* methodology, a plaintiff may establish a *prima facie* case of retaliation by proving three elements: (1) he engaged in a protected activity; (2) his employer acted adversely against him; and (3) a causal connection existed between the protected activity and the asserted adverse action. *See Hoyle*, 650 F.3d at 337; *Thompson*, 312 F.3d at 650. If a *prima facie* case is shown, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. *See Hoyle*, 650 F.3d at 337; *Fed. Credit Union*, 424 F.3d at 407. If the employer meets this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were in fact a pretext for retaliation. *See Hoyle*, 650 F.3d at 337. A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is "unworthy of credence" or by offering circumstantial evidence sufficiently probative of the issue of retaliation. *Price*, 380 F.3d at 212. Here, Roberts has failed to establish a causal connection between his protected activity and his termination. As discussed at length above, Roberts' termination was the result of his lengthy and well-documented performance deficiencies. Roberts has failed to adduce any admissible evidence to suggest a connection between his complaints about alleged workplace discrimination and his eventual termination. The Court must therefore grant the Hospital's motion for summary judgment as to Roberts' retaliation claim.

## IV. CONCLUSION

For the reasons discussed above, the Court grants the Hospital's motion for summary judgment in its entirety. Roberts' complaint is therefore dismissed with prejudice.

Dated: June 25, 2015 /S/
George Jarrod Hazel
United States District Judge